### Devante Jerome FOSTER, Appellant

v.

### The STATE of Texas, Appellee

### No. 05-15-01539-CR

Court of Appeals of Texas, Dallas.

Opinion Filed August 11, 2017

---

900

Riann C. Moore, Dallas County Public Defenders Office, Dallas TX, for Appellant.

Faith Johnson, Susan Hawk, Dallas County District Attorney, Kimberly Duncan, Assistant District Attorney, Dallas TX, for State of Texas.

Before Justices Francis, Brown, and Schenck

## OPINION

Opinion by Justice Francis

A jury convicted Devante Jerome Foster of aggravated sexual assault of six-year-old J.S., and the trial court assessed punishment at life in prison. In five issues, appellant contends venue was not proven, he is entitled to a new punishment hearing because the punishment record has been lost or destroyed, the trial court erred by admitting certain evidence, and his life sentence is grossly disproportionate to the offense and violates the objectives of the penal code. After reviewing the record, we overrule all issues. In a cross-issue, the State requests that we modify the judgment to correct several errors. A judgment has been filed correcting the errors, which moots the State's cross-issue. We affirm the trial court's judgment.

Tiffany S. is the mother of J.S. She met appellant through her brother, and appellant became a close friend of the family. In December 2007, Tiffany gave birth to J.S. J.S.'s father was not around, and appellant helped her with "[a]nything possible that we needed." Tiffany appreciated appellant's help because she was a single mother to J.S. and two daughters. Appellant bought J.S. toys and clothing, brought him his favorite foods to eat, and spent time with him. By the time J.S. was five years old, he was spending the night with appellant on weekends and had asked to call appellant "Dad." At the time, appellant lived in an apartment in Grand Prairie with his mother and brother. Appellant had his own bedroom, and when J.S. spent the night with him, the two shared a bed.

At first, J.S. went to appellant's apartment by himself. But, at some point, J.S. wanted someone to go with him on his overnight visits. J.S.'s two sisters went once, and some of his male cousins went with him at other times. On one occasion in the summer of 2014, J.S.'s ten-year-old uncle, J.J., went with him. Several weeks later, J.J. told his mother, Falicia, (J.S.'s maternal grandmother) that appellant made him "suck his private part" and "had sex" with him. That same day, J.S. told Falicia that his "dad" had done "the same thing" to him. Specifically, J.S. told his grandmother that he "would suck his dad's middle part," his dad "would in return suck his," and his dad "would have sex with him in the behind."

Falicia immediately called J.S.'s mother and was in the room when J.S. told his mother what happened. Later, Falicia asked the other children if anything had happened to them, and two of her grandsons reported appellant "made some sexual gestures" toward them. According to

Falicia, one grandson said he was in bed and appellant came up behind him and "went around the rim of his underwear." The child got out of bed and went to the living room. A second grandson said appellant "rubbed him on his thigh and his middle part."

Tiffany and Falicia went to the Grand Prairie Police Department the next day and reported what happened. Detective Timothy Paulson was assigned the case. He took statements from both women, observed the interviews of J.S. and J.J. at the advocacy center, and completed referrals for the boys to undergo physical examinations at Children's Medical Center. He then went to what he believed was appellant's address and met with a lady there who knew appellant. Later that day, appellant left twenty or more messages for Paulson. When Paulson called him back, they arranged for appellant to come to the station for an interview. During that interview, appellant acknowledged J.S. called him "Dad," he referred to J.S. as his "son," and J.S. spent the night with him by himself. He also confirmed he babysat both J.S. and J.J. within the past couple of months, and both slept in the same bed with him. He denied touching either child.

At trial, J.S. testified appellant was his "dad." J.S. said when he went to appellant's home, he played video games. When he stayed overnight, he slept in the bed with appellant. J.S. said appellant "did something" to him that was "bad" and explained appellant put his "middle part" in J.S.'s "behind." He said it "hurt." Using a drawing of an unclothed boy, J.S. identified the body parts he called the "middle part" and "behind." He said when he went to the restroom, there was blood. On one occasion, he said, J.J. was in the room when appellant put his middle part in his behind. J.S. also said appellant "used to make" him "suck on his middle part" and

appellant "peed" in J.S.'s mouth. J.S. said it tasted "[n]asty."

J.J. testified he spent the night at appellant's apartment with J.S. When it was time to go to sleep, he and J.S. slept in the bed with appellant. J.J. said he was awakened when he "felt something" in his "booty." J.J. moved, and appellant grabbed his hand and placed it on appellant's "private part." Appellant pulled J.J. on top of him and "kept pushing" on his booty before saying, "It ain't going nowhere." At the time, J.J. had on a shirt and underwear. J.J. said he got up, and "some white stuff" was on his shoulder. J.J. went to the bathroom to clean off his shoulder, and appellant made him come back into the room. Later that night, appellant put his private part into J.J.'s booty. At that time, J.J.'s underwear was down by his knees. He told the jury appellant also made him "suck" on his private part and it made his mouth feel "nasty." Appellant let him stop when "[s]omething white" came out of appellant's private part, and J.J. went to the bathroom and washed out his mouth. J.J. said he tried to get help from appellant's mother by knocking on her bedroom door, but she told him to go away. He also tried to use appellant's cell phone, but it fell behind the bed. Eventually, J.J. fell asleep on the floor. Although he said he did not see appellant do anything to J.S. that night, he felt the bed move and heard J.S. say, "Get off of me." The bed stopped shaking when J.J. threatened to go tell. The next day, J.J. told J.S. what happened to him, and J.S. said it happened to him too.

Bibiana Dominguez, a forensic interviewer with the Dallas Children's Advocacy Center, explained the process of interviewing alleged victims of child abuse. She said younger children have shorter attention spans and also communicate limited information. Dominguez interviewed both

J.S. and J.J. J.S. did not seem focused at times and "bounced around." But he made an outcry of sexual abuse and identified the perpetrator·as his dad. J.J. also made an outcry and identified the perpetrator. She saw no signs suggesting the children had been coached.

Sandra Onyinanjay is a certified pediatric nurse practitioner and the Sexual Assault Nurse Examiner (SANE) coordinator at Reach Clinic at Children's·Medical Center in Dallas. Onyinanjay performed examinations of both J.S. and J.J., and both were "normal." She said she expected a "normal exam" because it had been one month since the last incident and any injuries would have healed in that time. She described the examination process and said the lack of abnormal medical findings did not necessarily mean that abuse did not occur. Rather, she explained, our bodies are made "to heal and recover" from traumatic. events and said it is uncommon to have medical findings in a case where anal penetration has been alleged.

Katherine Dumond, a clinical supervisor at the Dallas Children's Advocacy Center, testified generally about sexual abuse trauma and therapy techniques. She also explained the process of "grooming" used by child offenders to "prepare" their victims. She said abusers groom the parents to gain their trust. They then begin to "work on" and "manipulate" the child, not only so the abuse can begin but also so it can continue. She explained delayed outcry and the reasons·children either wait to tell or never tell on their abusers. According to Dumond, some children are too young to understand what is happening to them. For example, a child who is being sexually abused by a father figure may believe "this is what fathers do." After the State rested, the defense called Dr. Michael Gottlieb, a psychologist who testified about the risk of altering a person's memory through thera-

py. Other witnesses were recalled to highlight inconsistencies in J.J.'s testimony. After hearing the evidence, the jury found appellant guilty of sexually assaulting J.S. The trial court discharged the jury, heard the punishment evidence, and imposed a life sentence.

■ In his first issue, appellant contends the State failed to prove that venue was proper in Dallas County. He argues the evidence is "patently not clear" where the offense occurred, Dallas County or Tarrant County. We disagree.

■ Sexual assault may be prosecuted in the county where the act occurs. TEX. CODE CRIM. PROC. ANN. art. 13.15 (West 2015). Venue must be proved by a preponderance of the evidence. *Id.* art. 13.17 (West 2015). Proof of venue may be established by direct or circumstantial evidence, and the jury may draw reasonable inferences from the evidence. *Cox v. State*, 497 S.W.3d. 42, 56 (Tex. App.—Fort Worth 2016, pet. ref'd).

J.S.'s mother testified J.S. spent the night with appellant while appellant was living at the Cottonwood Apartments in Grand Prairie with his mother and brother. She thought the apartment was "probably" in Tarrant County, but she did not know. Appellant's aunt testified that appellant's mother lived in Grand Prairie. She also testified she believed the residence was in Tarrant County but was "not sure."

Paulson, the Grand Prairie police detective assigned to the case, questioned appellant about the offense. Paulson testified he had been with Grand Prairie for ten years, first as a patrol officer, then as a member of the SWAT team, and then as a detective. The evidence showed appellant abused J.S. in an apartment in Grand Prairie where appellant lived with his mother. Although two witnesses thought the apartment could be located in Tarrant County,

neither was certain. On the other hand, Paulson, a ten-year veteran of the Grand Prairie Police Department, gave unequivocal testimony that the apartment was located in Dallas County. Paulson's testimony was sufficient for a reasonable jury to conclude by a preponderance of the evidence that the offense occurred in Dallas County. We overrule the first issue.

■ In his second issue, appellant argues he is entitled to a new punishment trial because the reporter's record on punishment has been lost and cannot be replaced.

After the appeal was perfected, the court reporter failed to file the reporter's record, prompting this Court to abate the appeal for the trial court to conduct a hearing to determine, among other things, the reason for the delay. At the hearing, court reporter Sharina Fowler testified the record was complete through the jury's verdict on guilt-innocence, but the record from the punishment phase was missing. She said she had made an exhaustive search but had "come up with nothing."

Fowler made contemporaneous notes during the punishment phase. She told the court, "I make notes as they are testifying and, you know, for example if they're a family member and in general what it is that they had to say when they were testifying. I make those hand notes." From those notes, she said the State resubmitted its case-in-chief and put on no additional evidence. The defendant called seven character witnesses, each of whom gave brief testimony. She explained that "most of them were anywhere from two minutes—I think the longest one was up to seven minutes." The State cross-examined only two of the witnesses. Fowler testified she had each witness's name, the approximate time each witness testified, and "in general what it is that they had to say when they were testifying."

On questioning by the trial court, Fowler said the first witness was appellant's brother, Dontae Foster, whose direct testimony lasted about seven minutes. Foster said appellant finished school through eighth grade and was "generous and honest." He was cross-examined for about two minutes.

The second witness was Janea Foster, appellant's twin sister. She testified for two-and-a-half minutes and said appellant had never been in trouble and was "goofy and generous." She was not cross-examined.

The third witness was Jaray Foster, who testified appellant was helpful. The direct examination was two-and-a-half minutes followed by one minute of cross-examination.

The fourth witness was Yulana Foster, appellant's mother. She testified for about three minutes and talked about appellant's character and why he dropped out of school in the eighth grade. She was not cross-examined.

The fifth witness was appellant's aunt, Selena Foster, whose direct examination was about two minutes. She told the court appellant attended church at Calvary Full Gospel. She was not cross-examined.

The sixth witness was Bryant Foster, appellant's cousin. He testified for about three minutes with no cross-examination.

The final witness was Montavyon Foster, whose direct examination lasted about six minutes. He testified to appellant's character and was not cross-examined.

Fowler said her notes would typically reflect any objections to the testimony, and her notes did not reflect objections were made. At the conclusion of Fowler's testimony, the trial court stated the following:

Okay. I just want to also put on the record that I am the one that did the punishment. That I do recall all the evidence from the guilt/innocence as well as the punishment. There were no objections made by either side. All seven witnesses for the Defense testified that as far as favorable evidence for the defendant, that he was—had a good character. They all asked nor [sic] leniency. The State did little on the cross of each of these witnesses, as per the previous testimony by the court reporter and what her notes reflect and based on what I heard during guilt/innocence of the State—guilt/innocence phase in trial. I concluded that the evidence warranted a verdict of a life sentence, so that was the sentence I gave.

The trial judge also stated the entire punishment phase lasted about thirty minutes, which included the testimony followed by "very brief closing arguments."

■ To be entitled to a new trial due to a missing record, appellant must show (1) he timely requested the reporter's record, (2) a significant portion of the record has been lost or destroyed through no fault of his own, (3) the missing portion of the record is necessary to his appeal, and (4) the parties cannot agree on the record. *See* TEX. R. APP. P. 34.6(f); *Routier v. State,* 112 S.W.3d 554, 571 (Tex. Crim. App. 2003). The third requirement—that the missing record be necessary to the appeal—was meant to mitigate against the harshness of a rule that might require a new trial even when no error actually occurred in the proceedings. *Nava v. State,* 415 S.W.3d 289, 306 (Tex. Crim. App. 2013).

■ Whether a missing portion of a reporter's record is necessary to the appeal's resolution is essentially a harm analysis. *Routier,* 112 S.W.3d at 571; *Issac v. State,* 989 S.W.2d 754, 757 (Tex. Crim.

App. 1999). When an appellant has not been harmed by the missing portion of the record, he should not be granted relief. *Nava,* 415 S.W.3d at 306. "[W]hen a trial judge's recollection is clear and shows that the missing portion of the record would not affect the appeal, the reason for enacting the third requirement becomes apparent." *Id.* When assessing a trial judge's recollection, we should view the circumstances from the appellant's standpoint and resolve any reasonable doubt resolved in his favor. *Id.*

In his brief, appellant argues that despite Fowler's summary of the evidence presented, he is unable to determine "what was said during the punishment trial, including any comments or findings by the trial court." Moreover, he asserts he cannot determine whether he received effective assistance of counsel. Specifically, he claims he "cannot make an argument concerning effectiveness of counsel, whether the trial court was impartial and neutral, nor perform a proper harm analysis" in the absence of a record. As authority, he relies on *Kirtley v. State,* 56 S.W.3d 48, 51–52 (Tex. Crim. App. 2001).

In *Kirtley,* the defendant pleaded guilty to murder and was placed on deferred adjudication for ten years. *Id.* at 49. The State later filed a motion to adjudicate, which the trial court granted and then sentenced Kirtley to thirty years in prison. The reporter's record from the adjudication/punishment hearing was destroyed by a tornado. Kirtley complained on appeal that the missing record precluded him from asserting an ineffective assistance of counsel claim. *Id.* at 50. This Court rejected his contention, concluding the missing record was not necessary to the appeal because the code of criminal procedure did not authorize an appeal from the determination to proceed with an adjudication of guilt. *Kirtley v. State,* No. 05-99-00236-CR,

2000 WL 688602, at *2 (Tex. App.—Dallas May 19, 2000) (op. on reh'g) (not designated for publication), *vacated and remanded*, 56 S.W.3d 48 (Tex. Crim. App. 2001). The court of criminal appeals disagreed, explaining an appellant may appeal errors occurring during the punishment phase of such a proceeding. 56 S.W.3d at 51–52. The court then summarily determined the missing record was necessary to Kirtley's claim of ineffective assistance of counsel without considering whether the claim had any actual or potential merit. *See id.* at 52.

Two years later, the court addressed a complaint about a missing record in *Routier v. State* and suggested mere speculation that a missing record might show error is insufficient. In *Routier*, a death penalty case, the appellant complained she was entitled to a new trial because a portion of her record was missing, including the court's instructions to prospective jurors, which she claimed "was necessary to her appeal because prospective jurors received preliminary instructions that may have been erroneous." *Routier*, 112 S.W.3d at 571. In response, the court stated:

> The appellant includes no point of error regarding the instructions given to prospective jurors. The suggestion that instructions *may* have been erroneous, without more, does not make that portion of the record necessary to her appeal.

*Id.*

We agree with our sister courts who have interpreted *Routier* to be a "reverse course" from *Kirtley*, in which a bare assertion that a missing record may show ineffective assistance of counsel was sufficient to meet the necessity requirement of rule 34.6(f). *See Nava v. State*, 379 S.W.3d 396, 413 (Tex. App.—Houston [14th Dist.] 2012), *aff'd*, 415 S.W.3d 289 (Tex. Crim. App. 2013); *Jimenez v. State*, 307 S.W.3d 325, 334 (Tex. App.—San Antonio 2009,

pet. ref'd) (appellant's suggestion that missing portion of record potentially could have assisted him on appeal not sufficient to show necessity requirement); *Cann v. State*, No. 13-06-00535-CR, 2012 WL 5187929, at *9 (Tex. App.—Corpus Christi Oct. 18, 2012, pet. ref'd) (mem. op. on remand, not designated for publication) (rejecting defendant's complaint about necessity of lost record, saying it was "not necessary for us to view the missing portion of the record to resolve a speculative claim that the portion may or may not reveal trial counsel's ineffectiveness"). Any complaint appellant is unable to determine "what was said during the punishment trial, including any comments or findings by the trial court" is nothing more than pure speculation that the missing record could potentially assist him in his appeal.

■ As for his ineffective assistance of counsel argument, appellant did not include any such complaint in his motion for new trial (before either side knew about the missing record), has not suggested any potential ground, and does not actually assert counsel was deficient in any way. Further, in presenting an ineffective assistance of counsel argument on direct appeal, absent direct evidence from trial counsel as to the role trial strategy played in the decision-making process, appellate courts are reluctant to find the record sufficient to overcome the presumption of competence. *Bone v. State*, 77 S.W.3d 828, 833–34 (Tex. Crim. App. 2002). Moreover, appellant brought two punishment issues, neither of which required a transcript of the punishment phase for disposition as shown below.

Finally, we have reviewed the record before us and conclude appellant has not shown the lost portion of the reporter's record is necessary for the resolution of

his appeal.[1] Although appellant's guilt was determined by a jury, his punishment was determined by the trial court following a thirty-minute proceeding. Missing from the record is the brief testimony of seven defense witnesses, who all testified to appellant's good character and sought leniency for appellant. No objections were made to his evidence, and only two witnesses were cross-examined by the State for less than five minutes total. In other words, appellant presented the evidence he believed was most favorable to him in hopes of persuading the trial court to be more lenient in his punishment—and he did so virtually unfettered. The trial judge, however, was unpersuaded by appellant's evidence. As the judge explained at the hearing on the lost record, she listened to the punishment evidence but concluded the facts of the case warranted a life sentence and imposed a life sentence. Those facts revealed appellant groomed J.S.'s mother to gain access to J.S., manipulated J.S. with games and toys to earn his trust, nurtured a relationship to the point J.S. called him "Dad," and then sexually abused not only J.S., but another child he brought to the home. As the fact finder at punishment, the judge had the discretion to do as she did. *Morano v. State*, 572 S.W.2d 550, 551 (Tex. Crim. App. [Panel Op.] 1978) ("When a defendant waives a jury trial, the trial judge has discretion to assess the punishment within the range provided by law which he finds appropriate under the circumstances."). Given the particular circumstances before us, we conclude the missing record is not necessary to the resolution of this appeal. To the extent the dissent reads our majority opinion to require a defendant to "show error actually occurred" before obtaining rever-

sal for a lost or missing record, such an interpretation stretches the meaning of our decision. We do not require a defendant to prove actual error, only to identify some particular error that the missing record could potentially assist with in his appeal. We overrule the second issue.

▆ In his third issue, appellant contends the trial court erred by allowing the State to adduce evidence about his sexual orientation during the testimony of Paulson, the investigating officer. He contends the evidence was not relevant and was more prejudicial than probative.

During a break in Paulson's testimony, outside the jury's presence, the State informed the court that during Paulson's interview of appellant, one of the issues discussed "was whether or not [appellant] had any attraction to men." The State argued appellant's answer was relevant "because these are young boys." Defense counsel objected the testimony was not probative because "being gay doesn't make you a pedophile" and also objected that its "probative value is far outweighed by the prejudicial effect." The State countered that testimony showed appellant had access to "females that spent the night" yet appellant did not commit a crime against them, indicating appellant's "motive in assaulting the two males rather than the females that he had access to." The State contended this was a "gender issue," not an issue of appellant being attracted to "little boys versus grown men." After hearing the arguments, the trial court overruled appellant's objections and allowed one question on the issue.

When the jury returned, the State continued to ask Paulson questions about his

---

1. Although the hearing reflects the parties would not agree to a record, the trial court did not specifically inquire as to whether they could agree nor did it make a finding on this

requirement. In his brief, appellant confirms his objections at the hearing to Fowler's testimony and to the summary of the missing record and admission of her notes.

interview of appellant. During this questioning, the State adduced the following testimony:

[PROSECUTOR]: Did you ask him this question, have you ever looked at men in general as being sexually attractive?

[DETECTIVE PAULSON]: It was—Yeah, it was along those lines and he said, yes, that he had, but that he had never acted on it.

Later, on cross-examination, defense counsel questioned Paulson about his investigation and his interview of appellant. During this questioning, the following was adduced:

[DEFENSE COUNSEL]: ... I'm not sure I heard this right, but the prosecutor was asking you, what do you have that corroborates these people's statements. Do you remember that question?

[PAULSON]: Yes, sir.

[DEFENSE COUNSEL]: And your answer was, well, he told us that he had thoughts about gay sex. Do you remember that?

[PAULSON]: Those—No, those were not the words.

[DEFENSE COUNSEL]: Well I'm not—I'm—Those are not the exact words I grant you.

[PAULSON]: I had asked him if he had ever had sexual thoughts about men.

[DEFENSE COUNSEL]: And he said yes.

[PAULSON]: Yes, sir, that he never acted on it.

[DEFENSE COUNSEL]: Now, how does being gay corroborate somebody being a pedophile?

[PAULSON]: I don't think that would be gay, having thoughts.

[DEFENSE COUNSEL]: Well, I mean, the prosecutor asked you, what do you have to corroborate that he had these interests in boys. The answer was

he said he thought about having these—a sexual encounter with a man.

[PAULSON]: She asked that under a different questioning part. The corroboration part, the only three things I said were the names that he knew them as, that he babysat them and that they slept in the bed with him.

[DEFENSE COUNSEL]: So you would agree that being gay has absolutely nothing to do with pedophilia?

[PAULSON]: Correct.

■ Assuming without deciding the trial court erred by admitting the complained-of portion of Paulson's direct testimony, we conclude the error is harmless. The erroneous admission of evidence is non-constitutional error. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). Accordingly, any error must be disregarded unless it affected appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). Substantial rights are not affected if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or had but a slight effect. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).

■ In assessing the likelihood the jury's decision was adversely affected by the error, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how the error might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002); *Schutz v. State*, 63 S.W.3d 442, 444–45 (Tex. Crim. App. 2001). We examine the entire trial record and calculate, as much as possible, the probable impact of the error upon the rest of the evidence. *Coble*, 330 S.W.3d at 280.

We question whether the complained-of evidence was in fact an affirmative statement about appellant's sexual orientation. Paulson was asked one question on the issue on direct—whether he asked appellant if he "ever looked at men in general as being sexually attractive"—and Paulson responded that appellant said he had but had not acted on it. Appellant's answer suggests nothing more than that appellant had found some men to be sexually attractive, not that he was homosexual. In fact, as shown in the above exchange, defense counsel initiated this line of questioning and incorrectly referred to "gay sex" during his cross-examination of Paulson.

But, to the extent the State's question and Paulson's answer could be perceived in such a way, we have examined the record and have a "fair assurance" its admission did not influence the jury or had but a slight effect. Appellant complains this evidence improperly suggests he had a propensity to molest "little boys." But Paulson later denied using the statement as evidence to corroborate the crime, disagreed the statement evidenced appellant was homosexual, and agreed being "gay" had "absolutely nothing to do with pedophilia." Thus, to the extent a juror may have inferred from Paulson's direct that appellant had homosexual tendencies and then further inferred some correlation between homosexuality and pedophilia, Paulson expressly refuted both views on cross-examination. We overrule the third issue.

In his fourth and fifth issues, appellant contends the life sentence is grossly disproportionate to the offense and violates the objectives of the penal code. Both issues were raised in a timely amended motion for new trial, which was overruled by operation of law without a hearing.

■ ■ ■ We begin with the fourth issue in which he complains about a disproportionate sentence. An allegation of dispro-

portionate punishment is a valid legal claim. *State v. Simpson*, 488 S.W.3d 318, 322 (Tex. Crim. App. 2016). The concept of proportionality is embodied in the Eighth Amendment to the United States Constitution's ban on cruel and unusual punishment and requires that punishment be graduated and proportioned to the offense. U.S. CONST. amend. VIII. This is a "narrow principle," however, that does not require strict proportionality between the crime and the sentence. *Simpson*, 488 S.W.3d at 322 (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring)). Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime. *Id.* (citing *Ewing v. California*, 538 U.S. 11, 23, 123 (S.Ct. 1179, 155 L.Ed.2d 108 2003) (plurality opinion)). A sentence is grossly disproportionate to the crime "only in the exceedingly rare or extreme case." *Id.* at 322–23. Generally, punishment assessed within the statutory limits is not excessive, cruel, or unusual. *Id.* at 323.

■ ■ ■ To determine whether a sentence is grossly disproportionate for a particular defendant's crime, we judge the severity of the sentence in light of the harm caused or threatened to the victim, the culpability of the offender, and the offender's prior adjudicated and unadjudicated offenses. *Id.* In the rare case in which this threshold comparison leads to an inference of gross disproportionality, we then compare the defendant's sentence with the sentences of other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. *Id.* If this comparative analysis validates an initial judgment that the sentence is grossly disproportionate, the sentence is cruel and unusual. *Id.*

Here, appellant was convicted of a first-degree felony, aggravated sexual assault of a child, and his sentence fell within the

range allowed for the offense. *See* Tex. Penal Code Ann. §§ 22.021(a)(1)(B)(i), (a)(2)(B), (e) (West Supp. 2015), 12.32 (West 2011). The evidence at trial showed appellant was a part of J.S.'s life from birth. He took him places, bought him toys, and had him spend the night on weekends. He was so much a part of J.S.'s life that J.S. asked his mother if he could call appellant dad. After earning J.S.'s love and trust, appellant began sexually abusing him. Appellant anally assaulted J.S. when J.S. was six years old and forced J.S. to perform oral sex on him. When J.S.'s ten-year-old uncle, J.J., went with J.S. to spend the night at appellant's apartment, the evidence showed appellant also abused J.J. Having reviewed the record, this is not one of those "rare" cases that leads to the inference that appellant's sentence was grossly disproportionate to the offense. Consequently, we see no need to compare his sentences to sentences imposed on others. *See Simpson*, 488 S.W.3d at 323. We overrule the fourth issue.

In his fifth issue, appellant argues the trial court erred by sentencing him to life in prison because the sentence violates the objectives of the penal code by, presumably, not giving due regard to one of the objectives, rehabilitation. He argues that even without a full punishment record, the court can "ascertain" he was "not without redeeming qualities making him a good candidate for rehabilitation" and that he was not "irredeemable in the eyes of the law."

We give a great deal of discretion to a trial judge's determination of the appropriate punishment in any given case. *Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984). Additionally, the general rule is that as long as a sentence is within the proper range of punishment, it will not be disturbed on appeal. *Id.*

As explained previously, appellant's sentence is within the proper range of punishment. Moreover, included in the penal code's objectives are deterrence and punishment as necessary to prevent the likely recurrence of criminal behavior. *See* Tex. Penal Code Ann. § 1.02(1)(A), (C) (West 2011). Although appellant argues the sentence is not "necessary to prevent the recurrence of the offense," we cannot agree. As previously set out, the evidence in this case showed appellant anally assaulted a six-year-old boy who looked on him as a father and also forced the child to perform oral sex on him. In addition, the evidence showed he sexually abused another young boy in the same manner and also made "sexual gestures" to other small children. Incarceration will prevent the recurrence of such criminal behavior because appellant will not have access to children. Incarceration does not, however, mean he will be denied the opportunity for rehabilitation. Given the nature of the offense and its circumstances, we cannot conclude appellant's sentence violates the penal code's objectives. We overrule the fifth issue.

In a cross-issue, the State asks that we modify the judgment to correct several errors. On June 15, 2017, we abated the appeal and ordered the trial court to enter a corrected judgment containing all statutorily mandated information. We have received the supplemental clerk's record containing the corrected judgment. Consequently, the State's cross-issue is moot.

We affirm the trial court's judgment.

Schenck, J., concurring

Brown, J., dissenting

DAVID J. SCHENCK JUSTICE, Concurring

I join in the Court's decision affirming the trial court's judgment. I agree with the Court's conclusion that *Routier v. State*,

112 S.W.3d 554 (Tex. Crim. App. 2003) is a reverse course from *Kirtley v. State*, 56 S.W.3d 48 (Tex. Crim. App. 2001), at least and especially where non-capital sentencing is concerned. I write separately only to underscore the context in which the error asserted here arises and why I believe it does not support presumed harm or reversal following *Routier*.

No one doubts that a defendant has a right to counsel at all stages of a criminal proceeding and that the sentencing phase of trial is important and subject to due process considerations. Nevertheless, there are material distinctions between the different phases of trial that inform our analysis and the decision whether to treat an error as presumptively harmful. For instance, after a defendant is convicted, the pre-conviction presumption of innocence, and many of the associated heightened constitutional rights—including the right to bail (except in capital cases) and the right to have the facts defining the offense found by a jury, and only on proof beyond a reasonable doubt—all disappear.[1] The decision of what particular punishment to assess within the statutorily prescribed range for a given offense is a normative, discretionary function and is different from the guilt–innocence determination and is not subject to any presumption. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 2(b)(2); *Barrow v. State*, 207 S.W.3d 377, 379–80 n.9 (Tex. Crim. App. 2006). Subject only to a very limited gross-disproportionality review, a punishment that falls within the legislatively pre-

scribed range and that is based upon the sentencer's informed normative judgment is unassailable on appeal. *Ex parte Chavez*, 213 S.W.3d 320, 324 (Tex. Crim. App. 2006). Indeed, because non-capital sentencing "may involve informal proceedings and standardless discretion," the Supreme Court openly questioned whether the ineffective assistance standard should be retained in that context in *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Likewise, no one doubts that the sentence here is substantial and, like any judgment depriving a citizen of life, liberty, or property, is subject to due process requirements. Still, these interests are not positioned in equipoise, and the distinctions between them are reflected in the procedural protections they are afforded. *E.g., Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). Capital cases like *Routier* are not about mere property or even liberty. Rather, the penalty of death is qualitatively different from a sentence of imprisonment, however long. *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) ("Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two."). As Justice Scalia observed, "death is different," and compels "protections that the Constitution nowhere else provides." *Harmelin v. Michigan*, 501 U.S. 957, 994, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Scalia & Rehnquist, JJ., concurring).[2] But

---

1. *E.g.,* TEX. CONST. art. 1, §§ 11, 15; TEX. CODE CRIM. PROC. ANN. art. 38.03 (West 2016); *Williamson v. United States*, 184 F.2d 280, 281 (2d Cir. 1950); *Nixon v. State*, No. 05-15-00485-CR, 2015 WL 4628230, at *2 (Tex. App.—Dallas Aug. 4, 2015, pet. ref'd) (mem. op., not designated for publication); *Martin v. State*, 753 S.W.2d 384, 388 (Tex. Crim. App. 1988).

2. "On the other hand, because there is a qualitative difference between death and any other permissible form of punishment, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Zant v. Stephens*, 462 U.S. 862, 884–85, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (quoting *Woodson* v. *North Carolina*, 428 U.S. at 305, 96 S.Ct. 2978); *see also Lockett v.*

unlike *Routier* or other capital cases—and all in which the death penalty is sought—neither of these interests were at stake here.[3]

As an intermediate court we are bound by the judgments of the Court of Criminal Appeals. *Routier* involved a mother who had been convicted of capital murder and sentenced to death for the murder of her son. *Routier*, 112 S.W.3d 554. In that case, the court reporter was unable to produce a reliable transcript of either the guilt–innocence or the punishment proceedings. *Id.* at 557–58. As described by the Court of Criminal Appeals, the reporter's "credibility [had] been seriously called into question." *Id.* at 569. The reporter eventually invoked her Fifth Amendment privilege against self-incrimination during the trial court's efforts to reconstruct the record, necessitating the retention of an expert to assemble an alternate version. *Id.* That expert, despite finding and correcting numerous, material errors in the original record, was unable to certify 53 pages from one day of the guilt–innocence proceedings—a gap likely approximating the sentencing hearing at issue here. *Id.* at 570.

"In addition, the trial judge who presided over the correction of the record had no personal knowledge of the proceedings at trial because he did not preside over the trial." *Id.* at 569. In addressing the lost portion of the record—as opposed to the corrected portions—the court accepted that Routier, like Foster, had not agreed to forego or accept an alternate to that portion of the verbatim transcript.[4] Still, and despite the capital context, the court subjected the error to a harm analysis, including a substantive examination of necessity of the transcript to the appeal. I believe that holding leaves no room for Foster's argument here.

Foster's right to counsel includes both the sentencing phase of his trial and this appeal of the life sentence. But the question presented here is by necessity one of defaults and presumptions. The presumption of regularity has been overcome insofar as the transcription error is concerned—there is none for the punishment phase of trial. We must decide whether that error presupposes (i.e., creates a presumption of) another viable error in

*Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ("in all but the rarest kind of capital case, [the sentence should] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record .... in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes."). While "not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state-court judgment, the severity of the sentence mandates careful scrutiny in the review of any colorable claim of error." *Zant*, 462 U.S. at 885, 103 S.Ct. 2733.

**3.** A sentence of life imprisonment without parole has also been subject to heightened scrutiny. *See Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). In a capital felony case like *Routier* in which the State seeks the death penalty, the defendant

adjudged guilty will be punished by imprisonment for life without parole or by death. TEX. PENAL CODE ANN. § 12.31(a) (West Supp. 2016). In capital cases in which the State does not seek the death penalty, a defendant who is found guilty receives an automatic life sentence without parole, unless the defendant was younger than 18 at the time of the offense, in which case he may be eligible for parole. *Id.* In a first degree felony case, such as the case here, an individual who has been adjudged guilty shall be punished by imprisonment for life or for any term of not more than 99 years or less than 5 years. *Id.* § 12.32(a) (West 2011).

**4.** If a rule of presumed error of harm obtained, it is difficult to imagine why counsel would ever agree to replace a lost or destroyed record to assist in prosecuting the appeal. *Cf. United States v. Sierra*, 981 F.2d 123, 127 (3d Cir. 1992).

the form of incompetence of counsel that might be explored by appellate counsel. Any rule that presumes reversible error would apply equally regardless of whether the defendant received the maximum sentence,[5] as here, or the minimum plus one day, or whether the gap in the transcript is large or small, as it is here. That is a conceptually viable rule, but contrary to *Routier*.[6] Rather than start with a presumption of reversible error as a necessary companion to a lost sentencing transcript, we should start with the presumption applicable to the suspected error—here a presumption of competency of trial counsel and impartiality of the presiding judge who conducted both the sentencing and hearing on the lost transcript—and let that presumption inform our determination of whether the transcript is necessary to the appeal's resolution. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *Tapia v. State*, 462 S.W.3d 29, 44 (Tex. Crim. App. 2015).

While Foster complains about the lack of his verbatim punishment phase transcript, he does not suggest that the reconstructed record, such as it is, omits any ruling by the trial judge that might have constituted error, let alone reversible error.[7] Instead, Foster quite candidly concedes that the transcription error has the effect of hampering his appellate counsel's search for possible ineffective assistance at the punishment hearing. Not all errors are equal. In this case the need to rely on a reconstructed telling of the events in order to determine the necessity of the transcript under Rule 34.6(f) merely impedes a fishing expedition for deficient performance that no one who attended the sentencing is aware of.[8] But, the ability to complain about the ineffectiveness of counsel on direct appeal, even where it is known and revealed by the transcript, is hardly a bedrock norm that would warrant treating the error here as structural.[9] In fact, the proceeding is unique to Texas and a handful of other states that permit ineffective assistance to be raised on direct appeal, as opposed to habeas corpus where collateral investigation of the facts and

5. Such a presumption might as easily reach to the sentencing judge's willingness to consider the full range of punishment or errors in instructing the jurors as alleged in *Routier*. One difference here is that the error asserted here—possible ineffective assistance of counsel—is itself subject to a presumption of competency that is contrary to the relief sought.

6. To the extent *Routier* left us free to create an assumption about the likelihood of actionable incompetence at sentencing that would have appeared on the transcript, empirical analysis would not support it. In the hundreds of thousands of sentencings conducted in Texas since *Routier*, only a handful involved actionable incompetence by defense counsel taking place during the proceedings and not developed in a subsequent motion for new trial. Had such a spectacular failing taken place, either the trial judge or others present would have presumably recalled same.

7. The defendant and his counsel were present for the sentencing hearing and the judge conducted a hearing to reconstruct the events. No one, however, has alleged that the State introduced improper testimony over an objection or that the defendant was unable to call a witness or to ask a question of a witness because of a ruling by the judge. Instead, there is no doubt that the defendant called seven witnesses and was able to ask them whatever question he felt germane and to conclude that effort in less than an hour.

8. Foster cites us to no examples of deficient performance by counsel actually fitting within the narrow grounds available in direct appeal so as to result in immediate reversal, and offers no hint as to why such an error might have occurred here.

9. *See, e.g., Sullivan v. Louisiana*, 508 U.S. 275, 278–79, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (cataloging errors exempt from harm analysis).

counsel's strategy can be pursued.[10] *E.g.*, TEX. CODE CRIM. PROC. ANN. art. 11.07 (West 2015). And, within that extraordinary direct appeal posture, we would require error in the form of lawyer incompetence or malfeasance that could not be explained, with the benefit of a presumption of competence, by any form of trial strategy and that likely resulted in an improper sentence even if some claimed error by the attorney could be found. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *McCoy v. State*, 996 S.W.2d 896, 900 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd). Instead, the error in the trial court insofar as it related to the appeal was redressed to the extent possible in the district court with all parties having the opportunity to relate their recollection of events, including the judge who actually presided and imposed the sentence. With no evidence of deficient performance by Foster's attorney being offered in that process, the harm we now address is confined to this appeal and is purely conjectural and contrary to a presumption of competence.

The Court of Criminal Appeals in *Kirtley* found the defendant required the punishment phase transcript to pursue his ineffective assistance theory on appeal, and thus presumed harm from its loss. *Kirtley*, 56 S.W.3d at 52. It did so, however, near the end of an era that afforded relief for any ineffective assistance in a non-capital case regardless of its effect on the outcome. *See, e.g., Hernandez v. State*, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999) (finding proof of harm necessary and rejecting contrary prior precedent); *cf.* TEX. R. APP. P. 44.2(b). Given that *Routier* involved a capital trial and a transcription error that reached into the guilt–innocence as well as the punishment phase, and the loss of 53 pages of the record from the guilt–innocence phase, I agree with the Houston Court of Appeals decision in *Nava v. State* that *Routier* reverses *Kirtley* and forecloses relief on direct appeal based on the naked assertion that a missing record may establish ineffective assistance of counsel. *Nava v. State*, 379 S.W.3d 396, 413 (Tex. App.—Houston [14th Dist.] 2012), *aff'd on other grounds*, 415 S.W.3d 289 (Tex. Crim. App. 2013). Read together, *Routier* and Rule 34.6(f) clearly require an appellant to do more than merely suggest the missing portion of the record might have revealed reversible error in order for review of that portion to be necessary. TEX. R. APP. P. 34.6(f). While Foster speculates that a missing record might have shown ineffective assistance during the brief punishment hearing, that speculation is not grounds for relief.

## ADA BROWN JUSTICE, Dissenting

Because I conclude that the record of the punishment phase of appellant's trial is necessary to resolve his appeal, and the absence of any record constitutes a fundamentally unfair proceeding, I respectfully dissent.

After the jury found appellant guilty of aggravated sexual assault of a child, the jury was discharged and the trial court proceeded to the punishment phase. TEX. PENAL CODE ANN. § 22.021 (West 2016). Because appellant had no prior convictions, the range of punishment for the offense was broad: five years to ninety-nine years, or life imprisonment and a fine of up to $10,000. *Id.* at § 12.32. The trial court assessed punishment at life imprisonment, the statutory maximum, and assessed no fine.

---

10. Eve Brensike Primus, *Effective Trial Counsel after* Martinez v. Ryan: *Focusing on the Adequacy of State Procedures*, 122 YALE L.J. 2604, 2625 n.16 (2013) (citing *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 734–36 (2002)).

Appellant timely appealed and filed an affidavit of indigency requesting the trial court appoint him appellate counsel and requesting the trial court order the court reporter to prepare the record. The trial court granted appellant's requests. Appellant's attorney filed a motion for new trial in which she challenged, among other things, appellant's life sentence.

The record was initially due to be filed on April 9, 2016. On April 11, 2016, the court reporter, Sharina Fowler, requested a thirty-day extension to file the reporter's record, citing a heavy workload. We granted Fowler's request and ordered her to file the record by May 13, 2016. On May 18, 2016, Fowler submitted a letter stating she would file the record on or before May 23, 2016. She did not do so.

On May 24, 2016, we ordered the trial court to determine why the record had not been filed, and the earliest date by which it could be filed. We abated the appeal to enable the trial court to comply with our order. The trial court conducted a hearing to make the findings we requested. At that hearing, Fowler testified she had not filed the record because she was unable to locate the record from the punishment phase; however, she was ready to file the remainder of the record.

Fowler further testified that she had handwritten notes that showed the State did not call any witnesses during the punishment phase. Her notes showed that appellant called seven witnesses, and that the

State cross-examined two of them. Fowler also testified about what her notes indicated the witnesses said at trial. Finally, Fowler also testified that her notes did not show that any objections were made during the punishment phase.[1]

Appellant's attorney, who did not represent appellant at trial, could not present competent evidence of what occurred (or did not occur) during the punishment phase that might entitle appellant to a new punishment hearing. Therefore, she stated that appellant did not want to proceed based on recollections. The trial judge stated that she recalled: (1) all of the evidence from both the guilt-innocence and the punishment phases of trial; (2) that there were no objections during the punishment phase; (3) that all of the witnesses who testified during the punishment phase were favorable to appellant; and (4) that, as confirmed by Fowler's notes, the State did little cross-examination. The trial judge said the evidence of appellant's guilt justified a life sentence, so that was the punishment she assessed.

After we reinstated the appeal, we ordered appellant to file his brief without the benefit of the record from the punishment phase of his trial. In his second issue, appellant contends he is entitled to a new punishment hearing because he cannot appeal any issues related to that proceeding, including a claim that his trial counsel was ineffective or that the trial judge was biased or not impartial.

---

1. Fowler did not specify whether the punishment phase was recorded stenographically or electronically. However, it appears Fowler's handwritten notes included the information a court recorder is required to log when proceedings are electronically recorded. That information includes: (1) the number and style of the case before the court; (2) the name of each person speaking; (3) the event being recorded such as the voir dire, the opening statement, direct and cross-examinations, and bench conferences; (4) each exhibit offered, admitted, or excluded; (5) the time of day of each event; and (6) the index number on the recording device showing where each event is recorded. *See* TEX. R. APP. P. 13.2. Rule 13.2 does not ask a court recorder to attempt to determine what may or may not constitute an objection or to characterize, interpret, or otherwise summarize the testimony of the witnesses.

As the majority notes, appellant relies on *Kirtley v. State*, 56 S.W.3d 48, 51–52 (Tex. Crim. App. 2001) to support his contention he is entitled to a new punishment hearing. In *Kirtley*, the record of Kirtley's adjudication and punishment hearing was destroyed in a tornado. *See Kirtley v. State*, No. 05-99-00236-CR, 2000 WL 688602, at *2 (Tex. App.—Dallas May 19, 2000) (op. on reh'g), *rev'd*, 56 S.W.3d 48 (Tex. Crim. App. 2001). On appeal, Kirtley asserted he was denied due process of law because the loss of the record prevented him from appealing punishment issues, including a claim he received ineffective assistance of counsel during that phase of the proceedings. *Id.* We concluded the missing record was not necessary to resolve Kirtley's appeal. *Id.* Instead of addressing Kirtley's argument, we concluded we did not need to review the record to resolve the appeal because Kirtley was not entitled to appeal from the decision to adjudicate and because the punishment the trial court assessed was within the statutory range.

The Court of Criminal Appeals reversed us because we had failed to give effect to appellant's full right to appeal, specifically his right to assert a claim of ineffective assistance of counsel at punishment. *See Kirtley*, 56 S.W.3d at 51–52. The Court explained that because Kirtley was entitled to assert that claim, the record from the punishment phase of his trial was necessary to his appeal. *Id.* at 52.

Two years later the Court of Criminal Appeals decided *Routier v. State*, 112 S.W.3d 554 (Tex. Crim. App. 2003). In *Routier*, the record was neither lost nor physically destroyed. The official court reporter, Sandra Halsey, transcribed, certified, and filed a complete record of the proceedings. *Id.* at 558. However, there were numerous mistakes in Halsey's record, which were the result of her failure to properly edit the record after her notes were transcribed. *Id.* at 558–60.

After the trial court removed Halsey as the court reporter in the case, another court reporter, Susan Simmons, corrected and certified Halsey's record, primarily with the use of audiotapes Halsey had taken of the proceedings; however, there were fifty-three pages of the transcription for which Simmons had no audiotape. Simmons corrected those pages by comparing them to Halsey's original stenographic notes. According to Simmons, those notes were complete, within the range of competent court reporting standards, and were not the reason there were multiple mistakes in Halsey's record. *Id.* at 560, 564, 567, 568, 570. Simmons refused to certify those pages as a true and accurate transcript of the proceedings. *Id.* at 562. Instead, she certified them as a true and accurate transcription of Halsey's notes of the proceedings. *Id.* at 570. Subsequently, the trial court ordered that the Simmons record replace the entire Halsey record.[2] *Id.* at 562.

On appeal, Routier argued she was entitled to a new trial because the uncertified portion of the record could not be used in her appeal and was therefore lost or destroyed. She claimed that that portion of the record was necessary to her appeal because "prospective jurors received preliminary instructions that may have been erroneous." The Court summarily rejected Routier's argument because she had not brought a point of error complaining of the instructions. *Id.* at 571. It was in that context that the Court stated "[t]he suggestion that instructions *may* have been erroneous, without more, does not make

---

**2.** Halsey could not correct and certify those pages herself because she had lost her certification while the appeal was pending. *See id.* at 566.

that portion of the record necessary to her appeal." *Id.* The Court further added that the instructions contained in the uncertified portion of the record were virtually identical to those given later that same day. *Id.* It is thus clear that the Court was relying on both the existence of the uncertified portion of the record and its contents in disposing of Routier's complaint. In other words, neither Routier nor the Court of Criminal Appeals was forced to speculate about what the missing record might contain.

Nevertheless, in *Nava v. State*, the Fourteenth Court of Appeals interpreted *Routier* as holding that a defendant's speculation that a missing record might reveal error is not sufficient to show the missing record is necessary to an appeal's resolution. *Nava v. State*, 379 S.W.3d 396, 413 (Tex. App.—Houston [14th Dist.] 2012), *aff'd on other grounds*, 415 S.W.3d 289 (Tex. Crim. App. 2013). Based on its interpretation of *Routier*'s holding, the Fourteenth Court concluded that, in order to show a missing portion of the record is necessary to an appeal, a defendant must show error actually occurred during a proceeding for which no record exists. The Fourteenth Court acknowledged that its interpretation of *Routier* created a conflict with *Kirtley*; however, it concluded *Routier* was a "reverse course" from *Kirtley*. *Id.* at 413; *see also id.* at 414 (conjecture may have been sufficient under *Kirtley*, it is not sufficient under *Routier*).

In this case, as in *Kirtley*, the record from the entire punishment phase of appellant's trial was lost or destroyed. As a result, appellant cannot appeal issues related to a mandatory and critical phase of his trial. Because he had a right to appeal those issues, appellant contends he is entitled to a new trial on punishment. Instead of endeavoring to distinguish *Kirtley*, the majority agrees with the Fourteenth Court

that *Routier* marked a reverse course from *Kirtley*.

According to the majority, under *Routier*, appellant was required to show some error actually occurred during the punishment phase of his trial. The majority does not explain how such a showing would be possible without *either* a certified or uncertified record of the proceedings. *See, e.g., Granado v. State*, 154 Tex.Crim. 519, 521, 228 S.W.2d 530 (1950) (statements in a brief cannot give appellate court knowledge of what occurred at a proceeding for which there is no record); *May v. State*, No. 05-13-00438-CR, 2014 WL 4207149, at *3 (Tex. App.—Dallas Aug. 26, 2014, no pet.) (mem. op., not designated for publication) (counsel's statements about what occurred at a hearing cannot substitute for a record of the pertinent proceedings). I respectfully conclude that the Fourteenth Court and our majority in this case have misinterpreted *Routier*. By doing so, I believe they have created a conflict where none exists. Routier had the benefit of a transcript of the missing record; that transcript was also available for the Court of Criminal Appeals to review. In contrast, Kirtley had no record at all of the entire punishment phase of his trial. It was for that reason Kirtley was entitled to a new punishment hearing.

Here, because we have no record of the punishment phase of appellant's trial, to review that phase of the proceedings, the majority relies on the record from the post-trial hearing, including Fowler's testimony and statements made by the trial judge about her recollections of the punishment hearing. Of note, the majority does not conclude any factual statement was made during that hearing, which, if true, renders our review of the punishment phase unnecessary. *See Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013) (trial court's memory of a discrete fact

may establish appellate review of record unnecessary). Rather, it reviews appellant's sentence by relying, at least in part, on what Fowler selectively chose to write down about the witnesses and their testimony, and the trial court's largely conclusory recollections of the punishment hearing. It is obvious that we cannot review appellant's punishment based on the record of the post-trial hearing. *See May*, 2014 WL 4207149, at *3 (counsel's statements about what occurred at a hearing cannot substitute for a record of the pertinent proceedings). Similarly, we cannot rely on the trial judge's explanation as to why she assessed a life sentence in resolving appellant's appeal. *See Eskridge v. Wash. State Bd.*, 357 U.S. 214, 215, 78 S.Ct. 1061, 2 L.Ed.2d 1269 (1958) (trial court's conclusion no reversible error occurred no substitute for appellate review). Moreover, neither Fowler's testimony nor the trial court's statements establish that appellant lacks a viable claim related to the punishment phase of the proceedings. *Cf. Nava*, 415 S.W.3d at 307 (missing record not necessary to appeal when appellate court can otherwise conclude it would support no viable claim).

The concurrence suggests that as this is not a capital case, the error is somehow of less consequence. A sentence of life in prison is of sufficient consequence to demand due process of law. The concurrence also highlights some of the implications of the majority's holding. When a trial court's official court reporter has lost the record, the trial court may conduct a hearing to recreate that record. This Court will then consider the trial court's reconstruction in place of the missing record, without appellant's agreement and over his objection.

According to rule 34.6(f)(4), a trial court is not permitted to replace a lost reporter's record absent agreement of the parties. *See* TEX. R. APP. P. 34.6(f)(4). Appellant is not required to agree to replace the record and he should not be forced to recreate a record based on the memories, if any, of the individuals who were present. As the Court of Criminal Appeals explained in *Nava*, "the point of having a record is not to have to rely upon the recollection of the trial judge or the parties." *Nava*, 415 S.W.3d at 306.

According to the concurrence, because appellant was personally present during the punishment phase, he should have been able to identify any trial errors or deficiencies in trial counsel's performance. However, appellant was entitled to the assistance of an attorney to review the record of the proceedings for him. *See Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (lawyers in criminal courts are necessities, not luxuries); *cf. Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (unrepresented appellant is unable to protect the vital interests at stake on appeal from criminal conviction).

It is undisputed that the attorney who was appointed to represent appellant in his appeal and whose duty it was to advocate on appellant's behalf was unable to review the testimony of *seven* mitigation witnesses who asked for leniency during the punishment phase of appellant's trial before he received the maximum prison sentence available under the law.

The concurrence speaks of impeding a fishing expedition in this case. If a criminal attorney's review of an appellate record is indeed such a fishing expedition, it is a constitutionally guaranteed one. *See Anders v. California.*, 386 U.S. 738, 744, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) (court-appointed counsel has a duty to carefully search the record for arguable errors). And it is the duty of zealous criminal advocates to be fishermen. *See id.*

Due process affords appellant the right to have us review the punishment phase of his trial for error. *Evitts*, 469 U.S. at 393, 105 S.Ct. 830 (in a first appeal of right, procedures employed "must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution"). Appellant also has the right to the assistance of counsel to review the record of his trial to determine whether he had grounds to appeal. Appellant has the right to assert any such grounds, and our Court's duty is to determine the merits of appellant's claims. Because the record of the punishment phase was lost through no fault of the appellant, Devante Foster was denied all of the above-described rights. Due process and fairness, I believe, require our Court to give him a new punishment hearing.

Therefore, I respectfully dissent.