

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JESSE VASQUEZ | § | No. 08-17-00187-CR |
| Appellant, | § | Appeal from the |
| v. | § | 409th District Court |
| THE STATE OF TEXAS | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20130D02392) |

## **O P I N I O N**

A jury convicted Appellant Jesse Vasquez of the felony offenses of capital murder and aggravated assault with a deadly weapon. The trial court sentenced Appellant to confinement for life and to ten years' confinement, respectively. On appeal, Appellant complains in three issues of prejudice resulting from the loss of a portion of the reporter's record, prejudice arising from the State's alleged *Brady*[1] violation, and error emanating from the trial court's refusal to give Appellant's four requested jury instructions. We affirm the trial court's judgment.

### *Factual Background*

In a multi-count indictment, Appellant was charged with the offense of capital murder for killing Miriam Aguirre by cutting her neck with a knife while committing or attempting to commit

---

[1]*Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194 (1963).

1

burglary of a habitation (Count I), and with the offense of aggravated assault with a deadly weapon for stabbing Enrique Contreras with a knife or a machete (Count III).[2] Although we present a detailed discussion of the evidence and procedural background as relevant to each issue below, we briefly recite the background facts.

Enrique Contreras first met Miriam Aguirre and her roommate, Rocio, at a birthday party held at Enrique's cousin's home on or about February 16, 2013. On that evening, Miriam asked Enrique to answer her phone and inform the male caller that she was not available. Enrique complied with Miriam's request and then ended the call.

At about 9:00 p.m. that evening, Walmart surveillance cameras recorded a man as he purchased a machete, a case of Budweiser beer, an air gun and ammunition, a cooler, and a twin-sized inflatable bed. The recordings and photographs taken from the recordings were admitted in evidence and published to the jury.

About a week later, on February 22, 2013, Enrique and Miriam saw each other again at Rocio's birthday party, which was also celebrated at the home of Enrique's cousin. At about 3:00 a.m. on February 23, 2013, Miriam drove Rocio—who was drunk—and Rocio's children back to the apartment in Rocio's minivan, and Enrique followed in Miriam's car. Enrique dropped his red Samsung phone between the seats in Miriam's car. He decided that he would retrieve his phone the next morning, locked the car, and went to the apartment with Miriam. After they arrived at the apartment, Appellant—with whom Miriam had been in a dating relationship—kicked on the door of the apartment and entered, cut Miriam's throat, and repeatedly stabbed Enrique.

---

[2]The trial court granted Appellant's motion for directed verdicts on Counts II (aggravated assault with a deadly weapon) and V (aggravated assault by threat and use or exhibition of a deadly weapon). The jury did not proceed to a verdict on Count IV (aggravated assault by threat and use or exhibition of a deadly weapon) because it found Appellant guilty of aggravated assault with a deadly weapon as alleged in Count III.

Police located Appellant's dark-colored SUV and inside found blood, Enrique's cell phone, Miriam's credit card, an empty air rifle package, an empty machete package, a Budweiser beer case, an air mattress, a knife, and forensic evidence. That afternoon, Appellant surrendered at El Paso Police Department headquarters.

## DISCUSSION

### I. New Trial

In his first issue, Appellant asserts that he is entitled to a new trial because a portion of the reporter's record is lost and is necessary to his appeal. The State counters that because Appellant has failed to show that the missing record is necessary to the disposition of any specific point of error, he is not entitled to reversal and a new trial.

### A. Applicable Law

Appellate Rule 34.6(f) establishes when an appellant is entitled to a new trial due to the loss or destruction of the reporter's record. TEX. R. APP. P. 34.6(f). Under Rule 34.6(f), an appellant is entitled to a new trial:

> (1) if the appellant has timely requested a reporter's record;
>
> (2) if, without the appellant's fault, a significant exhibit or a significant portion of the court reporter's notes and records has been lost or destroyed or—if the proceedings were electronically recorded—a significant portion of the recording has been lost or destroyed or is inaudible;
>
> (3) if the lost, destroyed, or inaudible portion of the reporter's record, or the lost or destroyed exhibit, is necessary to the appeal's resolution; and
>
> (4) if the lost, destroyed or inaudible portion of the reporter's record cannot be replaced by agreement of the parties, or the lost or destroyed exhibit cannot be replaced either by agreement of the parties or with a copy determined by the trial court to accurately duplicate with reasonable certainty the original exhibit.

*Id.*; *see Routier v. State*, 112 S.W.3d 554, 571 (Tex. Crim. App. 2003) (explaining that "the appellant must show (1) that a significant portion of the record was lost or destroyed, (2) through

3

no fault of her own, (3) that the missing portion of the record is necessary to her appeal, and (4) the parties cannot agree on the record").

## B.    Procedural Background

Because we examined this issue before the parties filed their appellate briefs, we set out the following procedural history.  After Appellant initiated the appeal of his convictions, we ordered the trial court to conduct a hearing to determine the status of the reporter's record, a portion of which had not been timely filed.  During the hearing, the trial court admitted in evidence the State's and Appellant's written stipulations, which in part stipulated that a significant portion of the record was lost or destroyed through no fault of Appellant and that the parties could not agree on the record.  The parties also stipulated that the missing portion of the record includes Appellant's pleas to the charges against him, the opening statements of the parties, as well as the direct and cross-examination—and any further redirect or cross-examination—of El Paso Police Officer Ana Artalejo, the first patrol officer to respond to the scene, and Officer Ruben Villareal, a crime scene officer.[3]

The prosecutor in the case, James Montoya, testified that both the State and Appellant were allowed ten to fifteen minutes to provide opening remarks and that over 100 exhibits had been introduced into evidence through Officers Artalejo and Villarreal.[4]  Montoya recalled that the trial court had overruled defense counsel's hearsay objection to Officer Artalejo's testimony regarding the statement of a frantic, very-scared woman with bloody hands who was attempting to leave with her children in a van when Officer Artalejo arrived.  Officer Artalejo instructed the woman—Rocio Dominguez—to wait, attempted to enter the apartment doorway which was blocked by Miriam's

---

[3] The officers' supplemental reports were admitted in evidence during the hearing.

[4] A total of three hundred and fifty-five State's exhibits were admitted in evidence during the trial.

4

body, and returned to Dominguez who informed her that Miriam's ex-boyfriend had "hit her," was in possession of a machete or a knife, and had departed by running down an alley. Montoya explained that the State had laid the foundation for an excited utterance exception to the hearsay rule regarding this evidence and agreed that no other attempt was made by defense counsel to impeach Officer Artalejo. Montoya also noted that voir dire had begun on a Friday and that the jury had returned its verdicts the following Friday. Appellant's counsel cross-examined Montoya and both parties provided arguments to the trial court.

In its responsive argument at the conclusion of the hearing, the State noted, "We still don't have a specific point of error and that needs to be stated today." Appellant did not respond to the State's observation and did not identify any specific point of error to the trial court showing that the missing portion of the record was necessary to the appeal's resolution. TEX. R. APP. P. 34.6(f)(3).

The record of those proceedings and the trial court's findings of fact and conclusions of law—including the trial court's conclusion that the missing portion of the record is necessary to Appellant's appeal—were filed in this court, and at our request the parties filed letter briefs. In his letter brief, Appellant declared, "The lost record is necessary to [Appellant's] appeal because each witness is important" and noted that the officers' missing testimony was necessary both to the trial and to the appeal. He also argued that the lost record was necessary to his appeal "because 120 exhibits were admitted" and "it is unknown if each and every one of the exhibits were offered and admitted" properly or erroneously or whether other error occurred. We construed Appellant's letter brief, in which he sought a new trial due to the loss of a portion of the record under rule 34.6(f), as a motion.

We reviewed de novo the trial court's determination that the missing portion of the record is necessary to Appellant's appeal and considered the trial court record of the hearing as well as the parties' subsequently filed letter briefs. *See Guzman v.* State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (holding that mixed questions of law and fact not turning on an evaluation of witness credibility and demeanor are reviewed de novo). We concluded that Appellant had not shown that the missing record is necessary to the appeal's resolution and explained our reasoning in a written opinion.

In our opinion on the motion, we noted that rule 34.6(f)(3) is essentially a harm analysis. In response to Appellant's claim that the missing record is necessary to his appeal because the testimony of Officers Artalejo and Villareal was important and necessary to the trial and appeal, we noted that a showing that a witness's testimony is significant does not serve as a substitute for a showing that the missing record is necessary to the resolution of the appeal. We explained that although a witness's testimony may be particularly significant, if an appellant fails to show that error occurred during the testimony or that the witness's testimony is needed to resolve a claim of error raised on appeal, then the record of the testimony is not necessary to resolution of the appeal under Rule 34.6(f)(3).

In response to Appellant's assertion that the missing record is necessary to his appeal because 120 exhibits were introduced through one or both police officers, we observed that Appellant had failed to identify any error that had occurred with respect to the admission of the missing exhibits and determined that his argument—that it is unknown whether the State laid the proper predicate for the admission of the exhibits—consisted of mere speculation that error *might* exist in the missing portion of the record. We concluded that Appellant's speculation that error

may exist in the missing portion of the record was insufficient to show that the missing portion of the record is necessary to the appeal.

We also determined that Appellant's mere suggestion that error occurred with respect to the admission of Officer Artalejo's hearsay statement was speculative and therefore was insufficient to support reversal for a new trial under rule 34.6(f).  We concluded that Appellant had failed under rule 34.6(f) to establish that the missing portion of the record was necessary to the resolution of any issues Appellant intended to raise on appeal and denied his motion. TEX. R. APP. P. 34.6(f)(3).

### C. Issue on Appeal

On appeal, Appellant challenges these rulings.  Because the parties stipulated to the facts supporting the first, second, and fourth requirements of rule 34.6(f), the rule's third requirement— that the lost record be necessary to the resolution of the appeal—is the only subject of Appellant's first issue.  TEX. R. APP. P. 34.6(f)(3).  Initially, Appellant asserts that the Court of Criminal Appeals' explanation that Rule 34.6(f) is "meant to mitigate against the harshness of a rule that might require a new trial even when no error actually occurred in the proceedings" improperly shift's the rule's "harshness" to him by requiring that he disprove a negative and rely on faded memories of counsel and witnesses to establish the occurrence of error.  *See Nava v. State*, 415 S.W.3d 289, 306 (Tex. Crim. App. 2013).  Appellant complains that our ruling requires that he prove a negative by producing non-speculative evidence that does not exist and asserts that even the testimony of the State's witness at the hearing in the trial court—the prosecutor in the trial proceedings—was speculative.  Because our opinion notes that "[p]resumably, the testimony of every witness is significant to the case or the person would not have been called as a witness[,]" Appellant asserts that our opinion "hinges on self-contradictory conclusions."  According to

7

Appellant, we concluded "that the lost testimony of . . . witnesses was not significant and, therefore, [was] not necessary to the appeal." Appellant argues that we faulted him for failing to prove a negative, a demand that he claims—without citation to supporting authority or further explanation—runs "counter to the dictates of the Eighth Amendment to the United States Constitution, which requires a greater degree of accuracy and finding than would be true in a non-capital murder case."

### D.     Analysis

As we did in our opinion on Appellant's motion, we rely on the guidance of the Court of Criminal Appeals. In *Issac v. State*, Issac complained that "a harm analysis cannot apply [under rule 34.6(f)] because an incomplete record, by virtue of its incompleteness, does not contain the data necessary to determine whether harm has occurred." 989 S.W.2d 754, 757 (Tex. Crim. App. 1999). The Court of Criminal Appeals disagreed, declared that rule 34.6(f)(3) is itself a harm analysis, and explained that "[i]f the missing portion of the record is not necessary to the appeal's resolution, then the loss of that portion of the record is harmless under the rule, and a new trial is not required." *Id.* The Court explained that "[a]lthough the lack of a record may in some cases deprive an appellate court of the ability to determine whether the absent portions are necessary to the appeal's resolution, an automatic rule of reversal is not justified." *Id.*

Subsequently, in *Routier v. State*, the Court clarified that an appellant's failure to identify a specific point of error that occurred in the missing portion of the record and her mere suggestion that error *may* exist in the missing record, without more, does not make the lost record necessary to the resolution of the appeal. 112 S.W.3d at 571. Stated differently, the first prong of the rule 34.6(f)(3) harm analysis requires that an appellant specify a point of error that occurred in the missing portion of the record. *Id.*

8

Thereafter, in *Nava*, the Court explained that rule 34.6(f) was "meant to mitigate against the harshness of a rule that might require a new trial even when no error actually occurred in the proceedings[,]" and clarified that "[w]hen an appellant has not been harmed by the missing portion of the record, he should not be granted relief." 415 S.W.3d at 306. Thus, the second prong of the rule 34.6(f)(3) harm analysis requires an appellant to show that he has been harmed by the missing record. *Id.*; *see also Foster v. State*, 525 S.W.3d 898, 908 (Tex. App.–Dallas 2017, pet. ref'd) (clarifying that an appellant need not prove actual error but must identify a particular error that the missing record could potentially assist in resolving on appeal).

An appellant does not satisfy his burden under Rule 34.6(f) by suggesting or speculating that the missing record or exhibit may show error. *See Routier*, 112 S.W.3d at 571 ("The appellant includes no point of error regarding the instructions given to prospective jurors. The suggestion that instructions *may* have been erroneous, without more, does not make that portion of the record necessary to her appeal."); *Foster*, 525 S.W.3d at 907 (observing that appellant's complaint that he was unable to determine the testimony or trial court's findings or comments was pure speculation that the missing record had the potential to assist him in his appeal); *Jimenez v. State*, 307 S.W.3d 325, 334 (Tex. App.–San Antonio 2009, pet. ref'd) (declaring that appellant's suggestion that the missing portion of the record potentially could have assisted him on appeal was insufficient to show that it was necessary to his appeal). Instead, the appellant must identify specific error and show that the missing record is necessary to its resolution on appeal. *See Routier*, 112 S.W.3d at 571; *Nava*, 415 S.W.3d at 306; *Foster*, 525 S.W.3d at 907. Appellant has failed to identify—in the trial court and on appeal—any specific error occurring in the missing portion of the record, and he has not shown that the missing record is necessary to the resolution of any error on appeal.

Appellant has not briefed his Eighth Amendment complaint and, absent such briefing, we decline to address it. TEX. R. APP. P. 38.1(i); *see Rhoades v. State*, 934 S.W.2d 113, 119 (Tex. Crim. App. 1996) (refusing to address issue that failed to provide specific legal authority and a legal argument based on that authority although issue provided a global cite to the Sixth Amendment). The Eighth Amendment addresses excessive bail, fines, and cruel and unusual punishments. U.S. CONST. amend. VIII. The missing record at issue here involves the guilt-innocence phase of trial and does not implicate excessive-punishment. We overrule Appellant's first issue.

## II. Untimely *Brady* Disclosure

In his second issue, Appellant raises a complaint under *Brady v. Maryland* and asserts that he was prejudiced by the State's untimely disclosure of favorable evidence. 373 U.S. 83, 87 (1963).

### A. Procedural Background

A surveillance video made by Graybar Electric of the area outside its premises shows activity involving Appellant's vehicle. Appellant specifically complains that the State untimely—and to his prejudice—disclosed a video surveillance recording made at Graybar Electric by posting the recording in a "portal" on Friday afternoon after voir dire had commenced. On Monday, Appellant filed written motions for continuance seeking time to review the recordings from each of Graybar Electric's surveillance cameras.

During trial on Tuesday, defense counsel re-urged his written motion for continuance outside the presence of the jury. He informed the trial court that he had no access to the portal on Friday evening, and although he complained that the video was approximately sixteen-hours long, defense counsel explained that an attempt had been made to determine whether the posted

recording was the same video that the State had provided to the defense team in 2013.  Although defense counsel asserted that differences existed between the recordings, he identified none to the trial court and did not demonstrate any differences between the 2013 video and the video that was placed in the portal during trial.  Defense counsel argued that he needed more time to reconcile the recordings.

When the trial court offered the parties an opportunity to watch the video during the Tuesday lunch break, the State informed the trial court that the parties had "just watched" a ten-minute portion of the video and noted that the State would be offering the original 2013 video recording in evidence.  The trial court offered defense counsel an additional ten minutes for review.  In response to defense counsel's question regarding the late posting of the video during trial, the State conceded, "We did put the exact same video on [the] portal on Friday in an attempt to convert it into a Windows Media.  It is easier to manipulate . . . so we don't have to sit through eight hours, but it is the exact same video."

In the jury's presence, the State laid the foundation for admission of the recording through Yvette Hernandez, an employee of Graybar Electric.  The State offered the recording in evidence as State's exhibit 235.  After defense counsel conducted a voir dire examination of Ms. Hernandez, he declared that he had no objection to the admission of the recording if it was the same 2013 recording but stated that he wanted "to make sure that CD [was] the one that [he had] seen."  The trial court allowed the State to play a portion of the recording and, noting that some portions of the recording would not be played for the jury until after lunch, the trial court delayed ruling on the admission of State's exhibit 235.

During a subsequent bench conference that day, defense counsel informed the trial court that he had reviewed the video recording and declared that he could not represent to the trial court

11

that the recording was exactly the same. Defense counsel suggested that there did appear to be some difference between the formats but admitted, "I cannot tell the difference. My biggest concern is based on what one of the officers, I believe, is going to attempt to testify to [that] I don't see on the video." Defense counsel explained that his "big concern"—what he wanted to explore— was whether "this officer"[5] had seen another video that defense counsel had not seen. The trial court denied Appellant's motion for continuance and overruled defense counsel's objection to the introduction of "this portion" based on his lack of opportunity to examine it.

Ms. Hernandez resumed her testimony under direct examination, and while viewing the recording during trial, she described an SUV parked near the business, a gold sedan that later arrived, two persons exiting the gold sedan, one person walking back to the passenger side of the sedan, another walking to the driver's side of the sedan, the gold car departing and later returning, and someone exiting the passenger side of the parked SUV. Ms. Hernandez then described the return of the gold sedan, noted that the person who had exited the SUV was putting on clothing and that another person had exited "the driver's side." Defense counsel cross-examined Ms. Hernandez but did not ask that she compare the 2013 surveillance recording with the recently posted recording. The trial court did not rule on the admission of State's exhibit 235.[6] The defense did not rest its case until Wednesday—without presenting evidence—and did not further assert any complaint to the trial court regarding the 2013 and 2017 video formats of the recording.

---

[5]Defense counsel's reference to "this officer" is unclear. Ms. Hernandez was employed by Graybar Electric, and the preceding officer who testified, Officer Ludovico Granillo, was assigned to the crime scene unit.

[6]An exhibit not expressly admitted in evidence may nonetheless be considered as evidence when the parties and the judge treat the exhibit as if it were in evidence. *See Harden v. State*, 417 S.W.2d 170, 174 (Tex. Crim. App. 1967); *see also Amador v. State*, 221 S.W.3d 666, 673–74 (Tex. Crim. App. 2007).

**B.      Analysis**

In *Brady* and its progeny, the United States Supreme Court determined that the suppression by the prosecution of evidence favorable to a defendant violates due process if the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. *Brady,* 373 U.S. at 87; *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000).  The duty to disclose encompasses both impeachment and exculpatory evidence.  *United States v. Bagley*, 473 U.S. 667, 676, (1985).

An appellant must satisfy three requirements to establish a *Brady* violation: (1) the state suppressed evidence; (2) the suppressed evidence is favorable to defendant; and (3) the suppressed evidence is material.  *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999); *Thomas v. State*, 841 S.W.2d 399, 402–03 (Tex. Crim. App. 1992) (citing *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972)).  The third prong, materiality, incorporates a requirement that defendant must be prejudiced by the State's failure to disclose the favorable evidence.  *Banks v. Dretke*, 540 U.S. 668, 691 (2004).  When, as here, the issue is the failure to *timely* disclose evidence favorable to the defendant, the defendant must show that had the State disclosed the potentially exculpatory material earlier, there is a reasonable probability that the outcome of the proceeding would have been different.  *Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999) (stating that because defendant had failed to identify at trial what witnesses would be called and did not explain on appeal or in the record what witnesses he might have called if attorneys were given more time to investigate tardy disclosure of exculpatory evidence, he failed to show that the State's delayed disclosure had prejudiced him).

We conclude that Appellant has not satisfied his burden under *Brady*.  First, he has not shown that the State suppressed any evidence.  *Little*, 991 S.W.2d at 866.  Appellant's defense

13

counsel and the State's prosecutor acknowledged that the State had disclosed the surveillance recording to defense counsel in 2013, four years before trial, and at trial the State declared that it would be offering the 2013 recording in evidence.

Second, Appellant claims that the tardy evidence was favorable to him because "there is evidence that the two video formats contained differences" and asserts that the differences in the 2013 and 2017 videos "would have been effective impeachment because impeachment includes [evidence] that contradicts other evidence." Appellant also speculates that the "conversion" of the 2013 surveillance recording in the portal may have resulted in technological deficiencies such as distortions of image, speed, audio, or video as "is common in video conversion" and argues without explanation that "the conversion brings in a host of issues ripe for effective impeachment." However, the record bears no evidence that the 2013 and 2017 videos differed in content, technical aspects, or otherwise.

There can be no *Brady* violation without suppression of favorable evidence. *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). Favorable evidence is any evidence that, if disclosed and used effectively, may make a difference between conviction and acquittal and includes both exculpatory and impeachment evidence. *Bagley*, 473 U.S. at 676; *Harm v. State*, 183 S.W.3d 403, 408 (Tex. Crim. App. 2006). Impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence. *Harm*, 183 S.W.3d at 408; *Thomas*, 841 S.W.2d at 404. Appellant has neither suggested nor shown that any differences in the 2013 and 2017 video formats, if they exist, would dispute, disparage, deny, or contradict other evidence and that, if such evidence had been disclosed earlier and used effectively, it may have made a difference between Appellant's conviction and an acquittal. Accordingly, Appellant has not shown that the evidence is favorable to him.

14

Third, because Appellant has complained of the tardy disclosure of evidence, he bears the burden of showing that, in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure of the evidence. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). The existence of a mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of Appellant's trial, does not establish 'materiality' in the constitutional sense. *Wilson*, 7 S.W.3d at 146. Rather, a defendant establishes a *Brady* violation by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Appellant has not shown that it is reasonably probable in light of all the evidence that the outcome of his trial would have differed if he had received the reformatted surveillance recording earlier in time. Consequently, Appellant has not shown that the evidence was material. *See Wilson*, 7 S.W.3d at 146 (stating that because defendant had failed to identify at trial what witnesses would be called and did not explain on appeal or in the record what witnesses he might have called if attorneys were given more time to investigate tardy disclosure of exculpatory evidence, he failed to show that the State's delayed disclosure had prejudiced him). Because Appellant has failed to establish a *Brady* violation, we overrule his second issue.

## III. Requested Jury Instructions

In his third issue, Appellant complains that the trial court erred when it denied four requested jury instructions on self-defense, defense of a third person, alternate perpetrator, and criminally negligent homicide.

15

### A. Standard of Review and Preservation

Appellate review of alleged jury charge error typically involves a two-step process. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g) (en banc). We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch*, 357 S.W.3d at 649. In our review of a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends. *Id.*

A defendant is entitled to a defensive instruction only if evidence is admitted supporting the defense. TEX. PENAL CODE ANN. § 2.03(c); *Shaw v. State*, 243 S.W.3d 647, 657 (Tex. Crim. App. 2007). A defense is raised by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true. *Id.* at 657–58. In determining whether a defense is thus supported, a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven. *Id.* at 658. If a defense is supported by the evidence, then the defendant is entitled to an instruction on that defense, even if the evidence supporting the defense is weak or contradicted, and even if the trial court is of the opinion that the evidence is not credible. *Id.* But the evidence must be such that it will support a rational jury finding as to each element of that defense. *Id.*

### B. Justification Defenses

At the charge conference, Appellant requested that the trial court instruct the jury on the defenses of self-defense and defense of a third person and submitted proposed written instructions for the trial court's consideration. The trial court denied Appellant's requests to instruct the jury on these defenses and his requests that the court reconsider its rulings.

16

**1. Applicable Law**

Penal Code Sections 9.31 and 9.32 address when a person is justified in using deadly force against another "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE ANN. §§ 9.31(a), 9.32(a)(1)–(2)(A). Accordingly, Appellant was entitled to a charge on self-defense if evidence was presented that showed that Appellant reasonably believed his use of deadly force was immediately necessary to protect himself against Enrique's use or attempted use of deadly force. *See Morales v. State*, 357 S.W.3d 1, 4 (Tex. Crim. App. 2011).

Under Penal Code Section 9.33, a defendant is justified in defending a third person if, under the circumstances as the defendant reasonably believes them to be, the third person would be justified in defending himself. *Morales*, 357 S.W.3d at 4. TEX. PENAL CODE ANN. § 9.33. Therefore, Appellant was entitled to a charge on defense of a third person if evidence was presented that showed that at the time Appellant assaulted Enrique, Miriam would have been entitled to use deadly force to act in self-defense, and that Appellant reasonably believed his intervention was immediately necessary to protect Miriam. *Henley v. State*, 493 S.W.3d 77, 97 (Tex. Crim. App. 2016); *Hughes v. State*, 719 S.W.2d 560, 564 (Tex. Crim. App. 1986) ("[T]he Legislature was merely placing the accused, who is the 'actor' under § 9.33, supra, in the shoes of the third person. So long as the accused reasonably believes that the third person would be justified in using deadly force to protect himself, the accused may step in and exercise deadly force on behalf of that person."). A "reasonable belief" is a belief that an ordinary and prudent person would hold in the same circumstances as the defendant. TEX. PENAL CODE ANN. § 1.07(a)(42).

17

## 2. Relevant Facts

Appellant did not testify at trial. Two eyewitnesses who were present when the events occurred did testify.

The first eyewitness, Enrique, testified that on the evening of February 22, 2013, he and Miriam—who he had met about one week earlier—attended a birthday gathering for Miriam's roommate, Rocio, at the home of Enrique's cousin. When they left the festivities at about 3:00 a.m., Miriam drove Rocio and Rocio's four children back to their apartment in Rocio's van, and Enrique followed them in Miriam's vehicle. After arriving at the one-bedroom apartment, Rocio slept in her bedroom.

Enrique took off his shoes and his Dan Marino jersey, under which he was wearing a black shirt. Enrique laid down on the long couch in the small living room where he began to doze off while Miriam attempted to put Rocio's daughter, Nancy[7], to bed in the living room with them. After Miriam turned off the light in the apartment, and while Miriam was sleeping next to him on Rocio's couch, Enrique awakened to the sound of banging or kicking on the apartment door. When Miriam jumped up and went to the door, Enrique saw Miriam's and another person's shadows. The wooden door swung open, and Appellant entered the apartment. Miriam argued with Appellant and attempted to remove him.

Enrique arose and tried to push Appellant outside the apartment. Enrique felt a sharp pain in his forearm and saw that it was "dripping." He told Nancy to run and call police, but she could not get out of the apartment. Enrique said he went to the bathroom for one or two seconds to wrap

---

[7]We use an alias to refer to the individual who was a minor at the time the charged offenses were committed. See TEX. R. APP. P. 9.10(a)(3) (providing privacy protection for sensitive data in criminal cases, including the name and birthdate of a minor).

18

a towel around his forearm, and then engaged in a physical altercation with Appellant for several minutes, which Enrique—who attempted to defend himself—described as "a fight for my life." Enrique was barefoot, could not move one arm, his other arm had been stabbed several times, and his nose had been cut and he could not breathe. In one instance, Enrique was atop Appellant and punched him, but Enrique sustained injuries during the encounter. Rocio pulled Enrique off Appellant, and Enrique slipped on a puddle of blood. Appellant got on top of Enrique and tried to cut his throat, but Enrique stopped him. Rocio pulled Appellant off Enrique, and Enrique grabbed Nancy and ran out of the apartment with Appellant chasing after them. Miriam was already on the floor. Enrique told Nancy to "keep running," and he then ran down an alley. Later, a dark-colored SUV drove slowly past Enrique, and Enrique heard the person inside yell that "if he couldn't have her[,] nobody could." Enrique returned to the apartment where he found Miriam alone and on the floor.

Enrique denied defense counsel's suggestion that he had cut Miriam but agreed that he had no discussions with her after he returned to the apartment because she was dead. When police officers arrived, they initially handcuffed Enrique but uncuffed him after Nancy informed police that he had tried to help. Enrique acknowledged at trial that he had a knife in his pocket during the encounter but claimed that he did not take it out. Enrique gave his knife to police and told officers that he did not have enough time to use it in his defense.

Rocio's daughter, Nancy, was the second eyewitness. According to Nancy, on the night of her mother's birthday, she was on a couch and with Miriam and Enrique in the living room of her apartment. After Miriam had locked one of the two apartment doors, Nancy heard someone knock at the window and then heard someone kick the door. Nancy saw Appellant enter the apartment with a machete and a "little" knife and begin to fight. Nancy saw Appellant stab Miriam.

19

Appellant took cell phones away from Nancy and stepped on them. Under cross-examination, Nancy testified that she had "really" seen Appellant cut Miriam and denied defense counsel's suggestion that Rocio had told Nancy that she had seen Appellant cut Miriam.[8] Nancy never saw Enrique take out a knife when he was fighting with Appellant. Nancy ran outside of the apartment and was followed by Enrique who told her "to run and run." When Nancy saw police arrest Enrique, she informed officers "[t]hat he was not the bad guy."

Miriam's cause of death was exsanguination from wounds to her neck, and her manner of death was homicide. According to the medical examiner, a person with this kind of injury will become unconscious in fifteen seconds and die in two minutes. Miriam suffered no other stab wounds, nor had cuts or significant injury to her hands such as defensive wounds. Enrique suffered stab wounds—including a wound that hit the bone—to his left forearm, nose, head, eyebrow, neck, front and back torso, shoulder, and hand, and he was hospitalized for one and one-half days.

Officer Devika Foster of the El Paso Police crime scene unit took photographs of Appellant on the evening of February 23, 2013. She testified that Appellant showed no visible cut marks or wounds to his face, nor injuries, marks, or scars other than a "possible scrape or cut" to his left index finger, a "little mark" on his back, and a scratch or skin missing from his right knee.

Reynalda Moreno, a neighbor who was not an eyewitness to the events within the apartment, testified that on the morning of February 23, 2013, she awaked at about 4:00 a.m. to the sound of "hits" and "noises on the wall" and heard a female say, "Look, Jesse, what you did." Nancy, who appeared to be very scared, arrived at Reynalda's apartment, did not enter, asked to use the phone for the purpose of calling police, and then ran. Reynalda called 9-1-1. Although Reynalda was busy on the telephone with the 9-1-1 operator, she testified that her husband—who

___

[8]Nancy had not seen her mother since "this happened" and did not know her mother's location.

was unable to testify due to illness—had been looking out the window and had informed her that he had seen a man wearing a blue sweatshirt leave the apartment with a bloody knife. She shared this information with the 9-1-1 operator and added that people were injured. Reynalda testified that Rocio had left with her children. She also claimed that the man who her husband had seen leaving earlier had returned to the apartment and that she could hear him fighting with another man.

### 3. Analysis

Appellant asserts that he was entitled to his requested justification defense instructions because the evidence showed that he acted in self-defense and in defense of Miriam while in reasonable fear of apparent danger from Enrique. In support of his contentions, Appellant claims the evidence shows that Enrique had on his person a bloody knife as well as a weapon in his vehicle, had a propensity for criminal activity, and had requested benefits in exchange for his testimony.

Based on our review of the testimony and evidence presented at trial, we cannot agree with Appellant's contention that the trial court erred when it denied his requested jury instructions on these defensive issues. No evidence showed—or had any tendency to show—that Appellant believed he needed to use deadly force in self-defense or for the immediate protection of Miriam from an immediate danger. *See Henley*, 493 S.W.3d at 77 (declaring requested instruction on defense of third person properly denied because proffered testimony had no tendency to show third-party children were in need of immediate protection nor pertained to whether the children were in immediate danger from unlawful force). Instead, the eyewitnesses described a predacious Appellant who arrived at the apartment armed with a knife and a machete, cut Miriam, cut Enrique both when he attempted to push Appellant out of the apartment and when Enrique attempted to

21

defend himself, crushed cell phones that could have been used to call for assistance, and thereafter fled.

Although Enrique had a Smith & Wesson® knife stored in his pants pocket, he testified that he did not use the knife during the encounter. Officer Ludovico Granillo, a blood spatter expert for the El Paso Police Department crime scene unit, testified regarding blood transfers on the knife and noted that the blade was open when a blood drop fell onto it. Cathy Serrano, a DNA forensic scientist with the Department of Public Safety Crime Lab in El Paso, acknowledged that DNA analysis cannot tell the jury "anything about how any DNA could have possibly landed" on a tested item and only reveals the likelihood that a person's DNA is present. Serrano explained, however, that forensic testing revealed that Enrique was the sole contributor of DNA found on the handle of his knife and could not be excluded as a contributor of DNA found on the blade of the knife.[9] In sum, the forensic tests showed that Enrique's blood—his DNA—was present on his own knife. Nancy, the only other eyewitness, testified that she did not see Enrique use the knife during the encounter.

No evidence showed that Enrique used or attempted to use deadly force, and there is no evidence that Appellant killed Miriam or assaulted Enrique out of a protective instinct for himself or Miriam. *See* TEX. PENAL CODE ANN. § 9.01(3) ("'Deadly force' means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury."); *see Bundy v. State*, 280 S.W.3d 425, 435 (Tex. App.–Fort Worth 2009, pet. ref'd) (stating that deadly force was not justified in response to attempted punch, which was not deadly force); *Schiffert v. State*, 257 S.W.3d 6, 14 (Tex. App.–Fort Worth 2008, pet. dism'd) (holding that a punch was not sufficient to demonstrate attempt to use deadly force).

---

[9]Alma was excluded as being a contributor to the DNA on the blade; the test results were inconclusive regarding Miriam and Appellant.

22

Nothing in the record reveals any basis for Appellant to reasonably believe that he needed to use deadly force against Miriam or Enrique. *See* TEX. PENAL CODE ANN. § 1.07(a)(42) ("'Reasonable belief means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor."); *see Kirkpatrick v. State*, 633 S.W.2d 357, 358 (Tex. App.–Fort Worth 1982, pet. ref'd, untimely filed) (concluding that defendant was not entitled to use deadly force when victim "hollered" at him and threatened to "kick his ass").

Further, Appellant's reliance on evidence that Enrique was facing pending charges for non-violent misdemeanor-level offenses in Alaska and had asked the prosecutor to write a letter that he could be swiftly returned to Alaska is misplaced as it is not evidence supporting the elements of the defenses of self-defense or defense of a third person. Enrique explained that he had moved to Alaska a few months after he was assaulted and that his pending Alaska charges at the time of trial—none of which were shown to be violent offenses—had been reduced to misdemeanors. Enrique had pleaded guilty to the remaining misdemeanor charges and was awaiting sentencing.

Enrique's trial testimony regarding a "weapon that was in the vehicle" related not to the events on the evening that Enrique was assaulted and Miriam was killed but, rather, to Enrique's subsequent gun charge in Alaska that had been reduced to a misdemeanor because the gun "was clean" and Enrique was not a felon. There is no evidence in the record that Appellant had a reputation or propensity for violence or a criminal history of violence.

Enrique, a permanent U.S. resident, also explained that he had a case pending with U.S. Immigration and Customs Enforcement (I.C.E.) and had asked the State of Texas to send him back to Alaska quickly so that he could resolve his case. Enrique clarified that the prosecutor had rejected his request to write a letter to I.C.E. in that regard and had told Enrique to hire an immigration attorney. Enrique denied that he had been offered or promised anything in exchange

23

for his testimony in Texas and stated that he was not hoping to get some favor from the State of Texas for his testimony. There is no evidence that Enrique testified in exchange for beneficial treatment by the State.

Because there is no evidence from any source that will support each of the elements of the justification defenses of self-defense or defense of a third person, the trial court correctly found that Appellant was not entitled to the instructions on self-defense or defense of third persons. *Shaw*, 243 S.W.3d at 657–58; *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001). Because there is no error, our inquiry regarding these requested instructions ends.

## C.    Alternative Perpetrator

Appellant complains that trial court failed to instruct the jury on "alternative perpetrator." Without specification, Appellant asserts that "there is significant evidence that Enrique Contreras was the true perpetrator" and proclaims that "the whole trial record shows a consistent theme: The adduced evidence is consistent with Enrique Contreras being the alternate perpetrator." During the charge conference, defense counsel requested and recited the following instruction for inclusion in the court's charge:

> You are instructed that our law within the province of this jury based on the evidence and testimony presented to you that there may have been an alternative perpetrator in the case presented to you. This evidence may have been presented either on its own or in combination with the other evidence in the record.

In support of its request for reconsideration of the trial court's denial of the instruction, defense counsel noted that the trial court had initially agreed in chambers to the instruction with a modification but had reversed its decision. Defense counsel argued that his question posed to Enrique under cross-examination—"Isn't it true you were the one who killed Miriam Aguirre?"—

provided a sufficient basis for giving the alternative perpetrator instruction and "goes along with everything else that you have and it does not harm the case rather than point it out."

## 1. Applicable Law

We first observe that Appellant directs us to no authority in support of his contention that an alternative perpetrator defense was raised by the evidence and that his requested instruction should have been granted. TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *see Muhammed v. State*, 331 S.W.3d 187, 195 (Tex. App.–Houston [14th Dist.] 2011, pet. ref'd) (stating that appellant's conclusory statements unsupported by legal citations to the record or legal authority in support of appellant's issue fell short of the minimum required to present the issue for appeal and declaring waiver of error due to inadequate briefing); *see also Ladd v. State*, 3 S.W.3d 547, 575 (Tex. Crim. App. 1999) (explaining that capital appellants are required to abide by published briefing rules and requiring them to do so does not offend traditional notions of fair play and substantial justice.).

Nonetheless, we proceed to examine Appellant's complaint in light of the authority that the State presents regarding the issue. As we have noted, Appellant is entitled to a defensive instruction only if evidence is admitted supporting the defense. TEX. PENAL CODE ANN. § 2.03(c); *Shaw*, 243 S.W.3d at 657. If there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true, the defense is raised. *Id.* at 657–58.

The right to present a defense includes the right to attempt to establish innocence by showing that someone else—an alternative perpetrator—committed the crime. *Wiley v. State*, 74 S.W.3d 399, 405–06 (Tex. Crim. App. 2002). However, to present evidence of an alternative

25

perpetrator, the defendant must show that his proffered evidence is sufficient to establish a "nexus between the crime charged and the alleged 'alternative perpetrator.'" *Id.* at 406. A defendant must do more than offer "unsupported speculation" of another, alternative perpetrator of the defendant's charged offense. *Id.* at 407 n.23 (quoting *United States v. McVeigh,* 153 F.3d 1166, 1191 (10th Cir. 1998)). "Although it is unclear exactly how much evidence is necessary to sufficiently prove a nexus between the offense and allegedly guilty third party, Texas jurisprudence is clear that evidence of third[-]party guilt is inadmissible if it is mere speculation that another person may have committed the offense." *Dickson v. State*, 246 S.W.3d 733, 739 (Tex. App.–Houston [14th Dist.] 2007, pet. ref'd).

### 2. Analysis

During the charge conference, Appellant did not direct the trial court to any evidence in support of his alternate perpetrator defense nor does he do so on appeal. We observe that during closing argument, defense counsel attempted to show a nexus between evidence that Enrique had a knife that had been opened at some point—because Enrique's blood drop was visible on it—and the fact that Enrique had returned to the apartment after fleeing. Because Reynalda had reported that she had heard men fighting after one of the men had returned, defense counsel suggested that Enrique had killed Miriam.

However, Reynalda had also heard a female state, "Look, Jesse, what you did," and, according to forensic testing, Miriam's blood was only found on the knife that was retrieved from Appellant's vehicle. No blood other than Enrique's was confirmed to be present on Enrique's knife. Appellant's fingerprints were found on the machete on which Enrique's blood was also present. None of the evidence connects Enrique to Miriam's murder.

Moreover, police located Appellant's dark-colored SUV in which Enrique's blood, Enrique's red Samsung cell phone, a credit-card bearing Miriam's name, a machete package, a Budweiser beer box, an empty package for an air rifle, an inflatable mattress, and the knife that tested positive for Enrique's and Miriam's blood were found. Based on the evidence in this case, Appellant's alternative-perpetrator defense is speculative.

Although it is unclear exactly what constitutes sufficient evidence to satisfy the *Wiley* alternative-perpetrator nexus requirement, we are unable to conclude that the evidence in this case satisfies the nexus requirement to establish an alternate-perpetrator defense. Because the evidence does not raise the alternative-perpetrator defense, the trial court did not err by refusing to provide the requested instruction to the jury. TEX. PENAL CODE ANN. § 2.03(c); *Shaw*, 243 S.W.3d at 657.

## D. Requested Instructions – Criminally Negligent Homicide

Appellant complains that "the charge completely lacks any reference to the lesser-included offense of criminally negligent homicide." We construe this as a challenge to the trial court's refusal to submit an instruction on the lesser-included offense of criminally negligent homicide. In the trial court, Appellant asserted that there was "more than a scintilla" and "enough" evidence to entitle him to an instruction on criminally negligent homicide as a lesser-included offense of murder.

### 1. Applicable Law

To determine whether the trial court should have given the jury a lesser-included offense instruction, we conduct a two-step *Aguilar/Rousseau* analysis. *State v. Meru*, 414 S.W.3d 159, 162 (Tex. Crim. App. 2013); *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012). In the first step, we determine as a matter of law whether the requested instruction is indeed a lesser-included offense of the offense charged. *Meru*, 414 S.W.3d at 162; *Cavazos*, 382 S.W.3d at 382;

27

*Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). To do this, we compare the elements of the offense as alleged in the indictment with those of the requested lesser offense. *Meru*, 414 S.W.3d at 162. This is a question of law that is independent of the evidence produced at trial. *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011); *see also Meru*, 414 S.W.3d at 162.

In the second step, we determine as a question of fact whether there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser offense. *See Meru*, 414 S.W.3d at 162–63 (citing *Hall*, 225 S.W.3d at 536); *Guzman v. State*, 188 S.W.3d 185, 188–89 (Tex. Crim. App. 2006). "[A]nything more than a scintilla of evidence may be sufficient to entitle a defendant to a charge on a lesser offense." *Cavazos*, 382 S.W.3d at 385; *see also Meru*, 414 S.W.3d at 163. In determining whether the evidence presented at trial supported an instruction on a lesser-included offense, we may not consider whether the evidence presented was "credible, controverted, or in conflict with other evidence." *Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998). Nevertheless, the evidence supporting an instruction on a lesser-included offense "must still be directly germane to the lesser-included offense[.]" *Cavazos*, 382 S.W.3d at 385 (recognizing that evidence must be "directly germane" to lesser-included offense before an instruction on a lesser-included offense is warranted). Further, this "threshold requires more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Cavazos*, 382 S.W.3d at 385.

### 2. Analysis

The Court of Criminal Appeals has recognized that criminally negligent homicide is a lesser-included offense of capital murder. *See, Cardenas v. State*, 30 S.W.3d 384, 392–93 (Tex. Crim. App. 2000) (declaring that criminally negligent homicide is a lesser-included offense of

murder and, therefore, capital murder); *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992) (recognizing that criminally negligent homicide is a lesser-included offense of murder); *Tompkins v. State*, 774 S.W.2d 195, 211 (Tex. Crim. App. 1987), *aff'd*, 490 U.S. 754, (1989) ("Criminally negligent homicide may be a lesser included offense of involuntary manslaughter, which may be a lesser included offense of murder, which may be a lesser included offense of capital murder."). Therefore, the first step of the *Aguilar/Rousseau* analysis is satisfied.

We next consider whether there was any evidence presented at trial from which a rational jury could have found Appellant guilty of criminally negligent homicide and not guilty of the greater offense of capital murder. As applicable here, a person commits the offense of capital murder if the person commits murder and intentionally commits the murder in the course of committing or attempting to commit burglary. TEX. PENAL CODE ANN. § 19.03(a)(2). Murder is statutorily defined as intentionally or knowingly causing the death of another, or alternatively, intentionally or knowingly causing serious bodily injury to another by committing an "act clearly dangerous to human life," resulting in that person's death. TEX. PENAL CODE ANN. § 19.02(b). A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a). A person acts knowingly when he is aware of the nature of his conduct and that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

A person commits criminally negligent homicide if he causes the death of an individual by criminal negligence. *Id.* § 19.05(a). A person acts with criminal negligence when he ought to be aware of a substantial and unjustifiable risk that the result will occur. *Id.* § 6.03(d).

In light of these definitions, in order for Appellant to have been entitled to an instruction on criminally negligent homicide, the record had to contain "some affirmative evidence" that

29

Appellant did not intend to kill or cause serious bodily injury to his victim, thereby allowing a rational jury to find him not guilty of murder. In addition, there had to be "some affirmative evidence" from which a rational juror could have concluded that Appellant had the lesser mental state required for criminally negligent homicide, *i.e.,* that he ought to have perceived—but did not perceive—that his conduct would result in the victim's death. *Cavazos*, 382 S.W.3d at 385. "It is [i]ncumbent that the record contain evidence showing an unawareness of the risk before a charge on criminally negligent homicide is required." *Mendieta v. State*, 706 S.W.2d 651, 653 (Tex. Crim. App. 1986).

Because Appellant did not testify, the record does not bear his statements regarding the issue of intent or awareness of the risk of his conduct. The evidence shows that after 3 a.m. in the morning, Nancy heard a knock on a window, a kick at the door, and then observed Appellant enter the apartment with a machete and a knife in his hands and cut Miriam, who died after suffering a deep wound that cut the main artery in her neck going to her head as well as the main vein returning from the head. Her body had few other injuries—one or two scratches, several bruises on the leg and left hand—but no cuts or other defensive wounds to her hands. The evidence also showed that when Enrique endeavored to assist Miriam in removing Appellant from the apartment by attempting to push him outside, Appellant countered Enrique's push by stabbing him in the forearm. As Enrique fought back by punching Appellant, Appellant continued to cut and stab him.

There is nothing in the evidence which indicates that Appellant was unaware of the risk his conduct created. *See Tompkins*, 774 S.W.2d at 212 ("Just because it might be speculated that appellant did not intend the result, given the admissible evidence, such does not change his awareness or perception of the risk his conduct created."). The evidence did not raise the issue of

criminally negligent homicide. Therefore, the trial court did not err in refusing to give the requested instruction on that defense.

Because the trial court did not err in refusing Appellant's requested instructions, we overrule Appellant's third issue.

## CONCLUSION

Because we have overruled Appellant's three issues, we affirm the trial court's judgment.

LINDA R. YANEZ, Retired Senior Justice

August 27, 2020

Before Rodriguez, J., Palafox, J., and Yanez, J., (Retired Senior Justice)
Yanez, J. (Retired Senior Justice), sitting by assignment

(Do Not Publish)